BANKERS TRUST COMPANY, as Trustee, Appellant, *v.* THE CITY OF YONKERS and Others, Respondents.

*Second Department, September 30, 1938.*

*Sherwood E. Hall* [*Adrian D. Stevenson* with him on the brief], for the appellant.

*William A. Walsh,* special counsel for the City of Yonkers [*Leonard G. McAneny, Corporation Counsel,* with him on the brief], for all respondents except the Yonkers Railroad Company.

LAZANSKY, P. J. For a number of years defendant Yonkers Railroad Company had been operating street car lines to the extent of about twenty-eight miles over highways of defendant city of Yonkers under franchises granted to it by the city. In voluntary proceedings in the Supreme Court, Westchester county, for the dissolution of the railroad on the ground of insolvency, a temporary receiver was appointed January 17, 1908, and then, by order of May 5, 1909, the railroad company was declared insolvent, ordered dissolved, and a permanent receiver appointed to receive and liquidate the franchises and other property of the railroad company.

On May 2, 1911, the city gave to the permanent receiver a franchise to construct and operate street surface railroads for public use, together with the necessary street equipment, along certain highways in the city, which, for convenience, have been described as locations 1 to 9. The term of the franchise was fifty years, subject, however, to termination at the end of twenty-five years if, twelve months prior thereto, the city gave the railroad company notice in writing of its option to terminate. Whereupon there was to be a fair valuation of the plant and property of the railroad in the highways, to be ascertained by three disinterested freeholders, acting as appraisers, one chosen by the mayor and common council of the city, one by the railroad, and the third by the two thus chosen. On payment of the amount of such valuation, the plant and property were to belong to the city. The permanent receiver had been authorized by the court to accept this 1911 franchise, and he did so accept it.

In 1912 the court vacated the dissolution proceedings and the receiver was instructed to transfer and did transfer to the railroad the franchise and other property held by him as such receiver.

One year prior to the expiration of the twenty-five-year term the city gave notice of its intention to exercise the option to terminate the franchise at the end of the twenty-five years and to purchase from the railroad the property used by it on the streets in the operation of its cars. Accordingly, it designated a person to act as an appraiser in its behalf and called upon the railroad to nominate its appraiser. No other steps have been taken or threatened by the city under the terms of the 1911 franchise. Defendant railroad has stood mute, and in this action admits the allegations of the complaint and consents to the judgment sought by plaintiff.

Plaintiff is successor trustee of bonds issued by the railroad company in 1896 in the aggregate sum of $1,000,000, secured by a mortgage on the franchises and other property then owned or thereafter to be acquired and owned by defendant railroad. In this action plaintiff seeks to restrain defendant railroad company from nominating an appraiser under the terms of the 1911 franchise and the city from doing any act or instituting any proceedings whereby any franchise of defendant railroad should be terminated under the provisions of said franchise or whereby the property of the railroad should be disposed of in any manner violative of the rights of plaintiff, and for other relief.

Plaintiff claims, in effect, (1) that the lien of the mortgage is superior to the city's rights under the franchise of May 2, 1911; (2) that certain franchises which had been granted by the city to the railroad company in 1899 and 1907, covering the nine locations, were never lawfully forfeited, are still in existence, and the railroad has been and still is operating under them; (3) that plaintiff is in no wise estopped to assert the rights of the bondholders against any action on the part of the city to deprive them of their mortgage security; (4) that the city has no legal authority to acquire street railroad properties, because the provision of the 1911 franchise providing for purchase by the city of the properties on the street is *ultra vires*.

The real point of importance propounded by plaintiff is that, as to it, the franchise of May 2, 1911, granted to the permanent receiver, and by him in turn transferred to the railroad company by order of the court, was invalid and ineffective; and that the railroad company is presently actually operating under franchises granted in 1899 and 1907, to which the mortgage attached.

In discussing these last named franchises, location 7 may be eliminated from consideration, for it is conceded by plaintiff that the lien of the mortgage did not cover that line on May 2, 1911.

On August 10, 1899, on the petition of the railroad company, franchises were granted by the city, and accepted by the railroad, for locations 1, 2, 3, 4 and 6. The term was for fifty years with a renewal for fifty years unless, at the end of the first fifty years, the common council determined to purchase, at a price to be fixed by an appraiser, the tracks and fixtures constructed under the franchise. Among other things, these franchises provided that a failure to comply with any of the conditions should be deemed a forfeiture and surrender of the franchises and they should become inoperative and of no effect, and, in such event, it should become the duty of the railroad company to remove the tracks from the streets and place the roadbed in as good a condition as when the tracks were laid. These franchises required the railroad to furnish general transfers over all or any portion of its lines and over those of the North and South Electric Railway Company for one fare not exceeding five cents. The North and South Electric Railway Company had been absorbed by defendant railroad in 1896. It was also provided that the work of laying the tracks under the franchises should commence within three months from acceptance and should be completed in full within one year from the commencement of work.

Evidently, the railroad had not completed the laying of the tracks as required, so, on or about November 30, 1900, there was an agreement for an extension of time. As part of the consideration for the extension, the railroad was to provide transfers so that, for one fare, passengers on any of its lines could be transferred to connecting New York city lines and passengers coming from New York city could be transferred to Yonkers lines. Defendant railroad was a subsidiary of the Union Railway Company operating in New York city, with which its lines were connected.

On August 17, 1899, the city granted a franchise for an additional or second track for location 5, the original franchise for which had been granted in 1886. The term was for fifty years with a renewal for a like period, subject to right of purchase at the end of the first period.

In March and April, 1907, the railroad received franchises from the city for locations 7, 8 and 9, and again for a second track on location 5. The franchises were granted upon the condition that for eight cents a passenger could ride from any of the lines in Yonkers to and over the elevated or subway roads in the borough of Manhattan or the borough of The Bronx, by transfers and otherwise, and upon the further condition that there would be transfers from each line to all other lines in the city of Yonkers. The franchises further provided that any failure, after demand, of the defend-

ant railroad to comply with these conditions, or any violation of them or any of them by the railroad, should be deemed a forfeiture and surrender of the consent, and the same shall become inoperative and of no effect.

The eight locations were being operated under the 1899–1900 and 1907 franchises when, on or about January 17, 1908, the dissolution proceedings above mentioned were commenced. The temporary receiver operated the railroad by direction of the court. While this was going on, the Union Railway Company, which, as stated, was operated in the city of New York, and was the means by which transfers were effected from and to defendant railroad, was in the hands of a receiver of the Federal court, who had been directed by that court to discontinue the transfer arrangement with defendant railroad. Thus, it was indisputably impossible for the receiver to comply, and he failed to comply, with the above stated traffic conditions of the 1899–1900 and 1907 franchises.

Under these circumstances, on November 30, 1908, the common council of the city undertook to forfeit and revoke, and adopted a resolution or ordinance forfeiting and revoking, these franchises. Thereupon negotiations ensued between the temporary, and thereafter the permanent, receiver and the common council, with the result that the city waived all its claims for damages or otherwise against the railroad under the 1899–1900 and 1907 franchises, canceled all bonds given pursuant to the franchises, and granted to it the franchise of May 2, 1911, above outlined. The permanent receiver was directed by the court to accept such franchise from the city, and it was accordingly accepted. On July 8, 1912, the court made an order vacating the dissolution proceedings and directing the permanent receiver to turn over the property in his hands to defendant railroad company. The predecessor trustee of plaintiff participated in the dissolution proceedings but objected to the order directing the permanent receiver to accept the May 2, 1911, franchise from the city. When the order vacating the dissolution proceedings and directing the transfer of the property in the hands of the receiver to the railroad was made, the predecessor of plaintiff trustee attended in court by counsel and made no objection to the order.

Plaintiff insists that the city had no power to forfeit these franchises merely by enacting an ordinance of forfeiture, but that such forfeiture could be effected only through judicial action at the instance of State authority; that, therefore, the grant and acceptance of the May 2, 1911, franchise was an empty ceremony because the 1899–1900 and 1907 franchises were and are still in existence and

are the ones giving the railroad company the right to operate on the nine locations. The city asserts that the ordinance revoking the franchises because of a conceded breach of an important condition immediately brought the earlier franchises to an end and that the cars were being operated on the stated locations under the May 2, 1911, franchise.

In considering the issue so presented, there should be noted the difference between the right to operate a railroad under its articles of incorporation, called a franchise, and the consent of a municipality required under the State Constitution (Art. 3, § 18), which is also generally called a franchise (secondary franchise, *Village of Stillwater* v. *Hudson Valley R. Co.*, 255 N. Y. 144). Of course, to annul articles of incorporation requires action by the State. (*Village of Stillwater* v. *Hudson Valley R. Co., supra.*) Appellant cites cases in other jurisdictions which seem to indicate that State intervention by court proceedings is essential in order to have forfeited a municipal consent. Procedure in such matters is a question of local law which differs in different jurisdictions. (*New York Electric Lines Co.* v. *Empire City Subway Co.*, 235 U. S. 179.) Forfeiture for non-user may be effected by a declaration of revocation by the duly constituted municipal authorities. (*Village of Stillwater* v. *Hudson Valley R. Co., supra; People ex rel. Village of Chateaugay* v. *P. S. Comm.*, 255 N. Y. 232.) " The revocation, if based upon sufficient grounds, is effective, without previous adjudication, from the time it is declared, just as it would be effective in like circumstances to terminate a private grant." (*People ex rel. Village of Chateaugay* v. *P. S. Comm., supra.*)

There is no dispute as to the facts upon which the common council declared the revocation.

Forfeiture may be declared for misuser as well as non-user. (*New York Electric Lines Co.* v. *Empire City Subway Co., supra; New York Electric Lines Co.* v. *Gaynor*, 218 N. Y. 417.)

*City of New York* v. *Bryan* (196 N. Y. 158) and *Matter of Clements* (191 App. Div. 279), cited by appellant, are not to the contrary. They deal primarily with the status of State franchises. (As to the former, see *Blanshard* v. *City of New York*, 262 N. Y. 5, at p. 14.) Here, local franchises are under consideration. They were subject to an important condition, validly imposed. (*Blanshard* v. *City of New York, supra; Matter of Quinby* v. *Public Service Comm.*, 223 N. Y. 244.) Concededly, it has been violated and, therefore, the 1899–1900 and 1907 franchises were effectively revoked by city ordinance.

Plaintiff also claims that the city never forfeited but merely expressed an intention to forfeit the franchises of 1899–1900 and

1907. The clear and unambiguous language of the revoking ordinance, coupled with other expressions in city council resolutions and ordinances and other relevant documents in the record, emphatically demonstrates that a revocation was intended by the ordinance.

Plaintiff makes a further claim that several of the locations were being operated at the time of the commencement of the action under franchises, granted prior to 1899, which did not contain the transfer privilege to the New York city line, and that those franchises are still in existence and give the railroad company the right to operate thereunder regardless of the termination of the 1911 franchise. This, in particular, has reference to locations 5, 6 and 2. By franchise granted February 8, 1886, there was a consent to the operation of line No. 5, known as the Mt. Vernon line, and also, possibly, a very small part of location 6, consisting of a few blocks. With respect of location 5, all that is here involved is the franchise for a second track. The 1886 franchise permitted the laying of not more than two tracks; but no part of a second track on location 5 was laid until 1893, when about two blocks (approximately 1,000 feet, according to the city map, out of a total distance of nearly three miles) were laid. No further work was done for a second track until after April, 1907. In the meantime, on August 17, 1899, as stated, a new franchise was sought by, and given to, the railroad company for the operation of the second track, and in April, 1907, another franchise therefor was sought and obtained.

It is very difficult, because of indefiniteness, to ascertain whether a small part of location 6 is really included in the franchise of 1886. Of itself, it is insufficient for the operation of a railroad. It is a small piece on Nepperhan avenue west of Lake avenue. The balance of line 6 was concededly in the August 10, 1899, franchise, and, therefore, the part of 6 granted under the franchise of 1886 is of little consequence here. This small piece of location 6 was not constructed until 1900.

With reference to location 2 and the balance of location 6, the claim seems to be that, under a franchise of August 3, 1894, which was granted to the North and South Electric Railway Company (absorbed by defendant railroad in 1896), certain rights are still retained by defendant railroad. In the case of location 2, construction took place in 1901, and in the case of 6, in 1900, both after the grant of the franchise of August 10, 1899.

Of course, it is hardly possible for a railroad company to operate the same line under two franchises from the same source at the same time. It is likely that the younger franchise is the basis of operation. When, in the case of the 1886 franchise, the railroad

company failed to build its second track on location 5 for many years and, in the case of locations 2 and 6, failed to build any tracks for six or seven years, the city had the power to have the franchises declared forfeited for non-user. (*Village of Stillwater* v. *Hudson Valley R. Co.*, supra; *People ex rel. Village of Chateaugay* v. *P. S. Comm.*, supra.) It is likely, in view of this situation, that the 1899 franchises were granted for 5, 6 and 2, and again for 5 in 1907. It may be fairly inferred that there was a surrender by the railroad and an acceptance thereof by the city of the 1886 and 1894 franchises, and the grant and acceptance of the new franchises of 1899–1900 and 1907. The rights of the mortgagee were subject to these surrenders by the railroad and acceptances thereof by the city of the earlier franchise. (*Hoffmann Brewing Co.* v. *Wuttge*, 234 N. Y. 469.) By the terms of the mortgage it became attached to the new franchises. If the 1899–1900 and 1907 franchises were not legally forfeited, as claimed by appellant, then it would seem that a similar situation of surrender and acceptance of those franchises took place as a result of the grant of the May 2, 1911, franchise to the permanent receiver. It has already been held that the May 2, 1911, franchise superseded all those that preceded it. (*Matter of City of Yonkers* v. *Maltbie*, 231 App. Div. 415.)

It is urged by plaintiff that the court in the dissolution proceedings had no jurisdiction to direct the permanent receiver to accept the franchise of May 2, 1911; that plaintiff is not bound or estopped by the court's order. Were this so, it surely would not be of advantage to plaintiff. Since the 1899–1900 and 1907 franchises had been lawfully revoked, the railroad would have been a trespasser and these franchises would no longer be security for the mortgage. However, in my opinion, the court had jurisdiction to make the order and plaintiff's predecessor was bound thereby. While it is an essential duty of a receiver, in proceedings to dissolve a corporation, to liquidate the properties, it is no less his duty, in the interests of the bondholders, under the supervision of the court, to be watchful for the preservation of the property to the end that the best possible dividends may be declared for the benefit of creditors. In the case at bar the receiver was helpless to fulfill a vitally important condition of the 1899–1900 and 1907 franchises, a condition of serious import to the inhabitants of the city of Yonkers. As a result, these valuable franchises, covering fifteen miles of road, were forfeited. Without operation over these locations, it was argued that the entire system would be made useless. In fact, plaintiff requested the court to find in this action that the recapture of these franchises would render the lien of the mortgage valueless. The court in the dissolution proceedings found that, as a result

of forfeitures and the controversies and differences between the railroad and the city, there was really no value left in the operated franchises. It was also found by that court that the proposed franchise would mean a benefit of at least $400,000 to the bondholders and other creditors. The adjustment of the differences undoubtedly placed in the hands of the receiver assets of large value for the benefit of the creditors. That the arrangement was pre-eminently satisfactory is indicated by the fact that, within fourteen months after the franchise was received, the dissolution proceedings were vacated and the receiver turned the franchise and other properties over to the railroad. It may be fairly inferred that new capital had been attracted. Details have not been furnished. It does appear, however, that with the new franchise the railroad company made sufficient returns to pay interest in full on the bonds for a period of twenty-five years. Thus, the receiver under court order was able to salvage property which was about to become valueless. In my opinion, it was within the jurisdiction of the court under the circumstances, in order to save the railroad from destruction and to enable its operation to be continued, to direct the acceptance of a new franchise with reasonable terms, such as were given in the case at bar.

Plaintiff's predecessor was a party to all these proceedings, and, though objecting to the order permitting the acceptance of the franchise, it never prosecuted an appeal from that order. Furthermore, it attended court when the order directing the receiver to turn the property over to the railroad company was made. It was bound by the determination of the court, as also are the bondholders. The trustee did not exchange or otherwise dispose of the security for the mortgage as was the case in *Colorado & Southern R. Co.* v. *Blair* (214 N. Y. 497). Here the trustee's aim was to protect the security. It appeared in proceedings wherein a receiver sought and obtained, under direction of the court, a new franchise which would inure to the benefit of the bondholders. In place of forfeited franchises, a valuable one was obtained. This materially increased the assets in the hands of the receiver and later was returned to the railroad and became subject to the mortgage. Under such circumstances, the trustee had implied authority to act for the bondholders. It is hardly likely that the trustee would have appeared by eminent counsel, whose remuneration would have to come from the limited income of the trust fund, if the bondholders had not empowered it to act. In any event, plaintiff failed to show that the bondholders had not authorized the predecessor trustee to appear for them. Frankness to that extent is called for by one who seeks equitable relief.

Plaintiff also argues that defendant city has no right under the terms of the 1911 franchise to purchase railroad properties on the street, since no such power is conferred upon it by its charter or specific statutory grant. In this connection it should be borne in mind that there is no proposal by the city to operate the roads. Assuming that plaintiff may raise the question of right to purchase, and that it is not one that is limited to action by the State, it seems that, under the broad powers granted by section 173 of the Railroad Law then in force, the provision for purchase by the city of the railroad property on the streets as provided by the 1911 franchise is legal. After naming certain specific conditions on which city authorities may base their consent to operate, section 173 provides, " also respecting any other matter concerning which, in their judgment, further conditions would be for the public interest." It certainly is a matter of prime public interest that, upon the termination of a franchise, the city should be in a position to have the railroad property in the streets under its immediate control for the purpose of facilitating the grant of a new franchise, or to operate the lines itself if the Legislature so provided, or to change from trolley cars to motor buses, or to discontinue operation entirely. Without this provision it is likely there would be serious delays and vexatious litigation and the railroad properties on the street would become a public nuisance.

The dismissal of the complaint was proper and the judgment should be affirmed, with one bill of costs to respondents filing brief.

Present — LAZANSKY, P. J., CARSWELL, DAVIS, JOHNSTON and ADEL, JJ.

Judgment unanimously affirmed, with one bill of costs to respondents filing brief.